**JPMORGAN CHASE BANK, N.A., Plaintiff,**

v.

**Mark L. FREYBERG, individually and on Conducting business under the name of The Freyberg Law Group, Defendant.**

14 Civ. 6851 (RMB)

United States District Court,
S.D. New York.

Signed March 17, 2016

Barry Jay Glickman, Bruce Seth Goodman, Zeichner Ellman & Krause LLP, New York, NY, for Plaintiff.

David S.J. Neufeld, Michael James Giusto, Neufeld & O'Leary, New York, NY, for Defendant.

### *DECISION & ORDER*

RICHARD M. BERMAN, UNITED STATES DISTRICT JUDGE.

This Decision & Order resolves the parties' cross-motions for summary judgment with respect to (1) JPMorgan Chase Bank's August 22, 2014 claim for reimbursement in the amount of $380,221.01, which is the amount of overdraft in the Chase business checking account of Mark L. Freyberg; and (2) Freyberg's November 4, 2014 claim that Chase was not entitled to reimbursement because Chase had assumed the risk that the $433,567.60 check which Freyberg had deposited in his Chase account on March 11, 2014 would be dishonored. The $433,567.60 check turned out to be counterfeit ("Counterfeit Check").[1]

---

1. Freyberg deposited the $433,567.60 Counterfeit Check into his Chase business checking account, and was later instructed by a purported new client, a Swedish company, to wire $389,950.00 to Tanaka Isseidon Gaishon, a foreign (Japanese) bank. After Chase was notified that the Counterfeit Check was, in fact, fraudulent, it debited Freyberg's checking account in the amount of $433,567.60, which resulted in a negative balance of $380,221.01.

## I. Background

On February 26, 2014, Mark L. Freyberg, the principal attorney with The Freyberg Law Group, received an unsolicited email from an individual purporting to be Ana Styrud ("Styrud"), Chief Financial Officer of Diamyd Medical AB, a Swedish corporation.[2] (Declaration of Barry J. Glickman, dated May 27, 2015 ("Glickman Decl."), Ex. 4 (Freyberg Dep. 28:21–29:4); Ex. 5.) The email to Freyberg stated that "[w]e were referred to your firm by A member of American Bar Association [sic]." (Id.) That same day, Freyberg responded to the email, stating "[f]eel free to call to discuss at any time ... Yes we specialize in litigation." (Id., Ex. 5.) No call was, in fact, made.

On February 28, 2014, Freyberg received a second email from Styrud, which informed Freyberg that Diamyd would "need your firm's legal help to assist us with a breach of contract matter and also retrieve funds owed to our company," from Praxair, a company headquartered in Danbury, Connecticut. (Id.) According to the email, Diamyd had "ordered goods from Praxair...[but] no goods were delivered. We asked for a refund but they refused to make the refund to us. The amount in dispute is $633,567.60." (Id.) That same day, Freyberg responded by email, and stated that he would "need to review all contracts, correspondence, invoices, and other documents related to the transaction and the dispute." (Id.)

On March 3, 2014, Styrud responded and attached documents purporting to be the contract between Diamyd and Praxair. (Id., Ex. 8). The email requested that Freyberg "send [ ] your standard retainer agreement and address the retainer agreement to Mr. Peter Zerhouni who is the President of Diamyd Medical AB." (Id.).

That same day, Freyberg provided a retainer agreement to Zerhouni and instructed that "[a] retainer and minimum fee in the amount of $5,000.00 shall be required in connection with this retention, and shall be applied to our time charges of $585.00 per hour." (Id., Ex. 6.) Zerhouni responded and provided a signed retainer agreement, but no retainer. (Id., Ex. 7.) Zerhouni advised that "[w]e will inform you shortly on when we will remit the Retainer Agreement Fee." (Id.) No retainer fee was ever sent by Zerhouni to Freyberg.

On March 3, 2014, Zerhouni sent an email (with a copy to Freyberg) addressed to Vanessa A. John ("John"), Global Diversity Director for Praxair. (Id., Ex. 9.) In the email, Zerhouni informed John that:

> [O]ur company is at the verge [sic] of retaining the service of a lawyer in your Country. With due respect to this approach, we will no longer be receiving payment directly from your firm, any future refund will be directed to the attention of our Attorney.

(Id.)

On March 4, 2014, John purported to respond to Zerhouni, copying Freyberg, and stated: "[A]fter careful consideration and review, we decided that it is in the best interest of our company to settle this dispute ..." (Id.) The email also stated that "[s]ince we will be making the payment to your Attorney, We would request him to forward to us the below details. We will be remitting a Cashier's Check for part payment of $433,567.60 and schedule to remit the balance on 17 th of March 2014 with whatever interest that has been incurred." (Id.) **Freyberg almost immediately emailed Zerhouni and asked "when I can expect to receive the retain-**

---

**2.** The parties do not dispute that the individuals Freyberg communicated with during the course of the Counterfeit Check scam, including Ana Styrud, Peter Zerhouni, and Vanessa A. John, were imposters. They were not the people they represented to be.

er fee set forth in the agreement we signed yesterday?" (*Id.,* Ex. 10) (emphasis added.) In response, Zerhouni stated that Freyberg could "deduct [his] retainer fee and any other fee incurred" from the settlement check proceeds. (*Id.,* Ex. 11.)

On March 11, 2014, Freyberg received a letter purportedly from John, enclosing a check for $433,567.60. The check appeared to be from a Bank of New York account held by Praxair and made payable to the Freyberg Law Group. (*Id.,* Ex. 4 (Freyberg Dep. 108:9–11); Ex. 13.) This was the Counterfeit Check. That same day, Freyberg emailed John and Zerhouni confirming receipt of the check. (*Id.,* Ex. 13.) Zerhouni replied and requested that Freyberg "go ahead and deposit the check ... [p]lease confirm when payment will be available for wire as we will need part of our funds transferred to the firm in Japan." (*Id.*) On March 11, 2014, Freyberg attempted to deposit the Counterfeit Check in his Chase personal checking account at a branch in Manhattan. (*Id.,* Ex. 21; Ex. 24.) Chase provided a transaction summary that stated **"checks within this deposit may not be paid because of information we've received from the paying bank or due to information we have within our systems,"** *i.e.,* March 20, 2014. (Neufeld Aff., Ex. D) (emphasis added.)

On March 12, 2014, and after Chase alerted Freyberg that he had incorrectly made the deposit in his personal checking account, Freyberg instructed Chase to transfer the deposit to his Chase business checking account, which Chase did. (Glickman Decl., Ex. 4 (Freyberg Dep. 131:6–14; 133:6–19).) That same date, Freyberg emailed Zerhouni with a copy of the transaction summary, and stated "You will note on the slip that the bank is stating that the funds will be available on March 20. **However, I have placed a call to a manager at the bank and expressed my view that this is an unduly long waiting period."** (*Id.,* Ex. 14) (emphasis added.) According to Freyberg, he left a message informing the Chase manager at the Manhattan branch that "my understanding was that I had deposited a bank check that should be [ ] cashed immediately." (*Id.,* Ex. 4 (Freyberg Dep. 157:18–20).)

On March 13, 2014, Zerhouni emailed Freyberg instructions to "wire [ ] to our creditor: Tanaka Isseidon Gaishon the sum of $389,950.00." (*Id.,* Ex. 15.) The email to Freyberg also stated that **"[d]ue to the time difference between us, we want you to have this transfer executed today before 12:30 your time and make the value date of the transfer 13**[th]**March ..."** (*Id.*) (emphasis added.)

Also, on March 13, 2014, Freyberg appeared at a Chase branch in Manhattan and spoke with Angel Miranda, a Chase private client banker. (*Id.,* Ex. 4 (Freyberg Dep. 175:19–176:9).) Freyberg instructed Miranda to wire $389,950.00 to Tanaka Isseidon Gaishon. (Pl.'s Rule 56.1 Statement, dated May 27, 2015, at ¶ 55.) Chase Fraud Analyst Ethan Merrick reviewed Freyberg's March 13, 2014 wire request and "flagged" the Counterfeit Check for "suspected fraud." (Glickman Decl., Ex. 25 (Merrick Dep. 54:19–22).) **Chase notified Freyberg that there would be a hold on the wire until Freyberg could provide proof that his deposited $433,567.60 check "would 'clear,' or until March 26, 2014,"** *i.e.,* **10 business days after the wire request was made.** (56.1 Statement at ¶ 56; *see also* Glickman Decl., Ex. 25 (Merrick Dep. 54:23–55:5); Affidavit of David Neufeld, dated June 29, 2015 ("Neufeld Aff."), Ex. F (Miranda Dep. 88:16–89:10)) (emphasis added.)

On March 14, 2014, Freyberg visited another Chase branch in Chappaqua, New York, and spoke with Chase "relationship banker" Joseph Szygiel ("Szygiel") about

the hold on his wire request. (Glickman Deck, Ex. 4 (Freyberg Dep. 186:12–13).) According to Freyberg, he spoke with Szygiel in order to "request[ ] information concerning the status of the Check and wire . . . [and] wanted to be sure the funds had been properly collected before the wire was processed." (Freyberg Aff. at ¶ 14.) According to Szygiel, Freyberg "asked [him] specifically to have the wire transfer released" and Freyberg did not "have any questions about why there was a hold on [the wire]." (Glickman Deck, Ex. 23 (Szygiel Dep. 64:25–65:7).) At Freyberg's request, Szygiel contacted Chase's Banker Support Department and Operating Loss Prevention Department in an effort to release the wire. (*Id.*, Ex. 23 (Szygiel Dep. 64:14–66:17).) According to Freyberg, after about forty minutes, Szygiel gave Freyberg a "thumbs up," and informed him that Chase's Operating Loss Prevention Department had released the hold on the wire and that it would be sent. (*Id.*, Ex. 4 (Freyberg Dep. 190:24–192:25); Ex. 23 (Szygiel Dep. 67:19–21).)

On March 17, 2014, *i.e.* three days after the wire had been sent, Bank of New York informed Chase that the $433,567.60 check Freyberg deposited on March 12, 2014 was, in fact, counterfeit. (*Id.*, Ex. 21; *see also supra* p. 180 n. 1.) Thus, there were insufficient funds in Freyberg's account to support the wire transfer which had been sent on March 14, 2014. On March 17, 2014, Chase notified Freyberg that the Counterfeit Check had been returned as unpaid. (*Id.*, Ex. 4 (Freyberg Dep. 207:11–14).) Chase attempted to stop Freyberg's wire transfer, but was unable to do so. (*Id.*, Ex. 29 (Byrne Dep. 68:7–24).) As a result, Chase deducted the $433,567.60 Counterfeit Check deposit from Freyberg's business checking account, which resulted in a negative account balance or overdraft of $380,221.01. (*Id.*, Ex. 24; *see also supra* p. 180 n. 1.)

On August 22, 2014, Chase filed the Complaint in this Court against Freyberg, alleging that Defendant's failure to reimburse Chase for the $380,221.01 overdraft constitutes a "material breach of the Account Agreement." (Chase Complaint, dated Aug. 22, 2014 ("Compl."), ¶ 29.) On November 4, 2014, Freyberg filed an Answer and Counterclaims, alleging that: "Plaintiff's claims are barred by the doctrine of estoppel, as *inter alia.* Plaintiff withheld information in its possession from Defendant . . . . [and] acted recklessly, in bad faith, and with disregard for Defendant in wiring funds from Defendant's account." (Def.'s Answer ¶¶ 24–25.) In addition, Defendant asserted four counterclaims, namely, negligent misrepresentation, fraudulent misrepresentation, violation of the Expedited Funds Availability Act ("EFAA"), and violation of the Uniform Commercial Code ("UCC"). (*Id.* at 14, 16, 17, 19.)

On May 27, 2015, Chase filed a motion for summary judgment, arguing, among other things, that "Defendant is liable for the overdraft [$380,221.01] as a matter of law and under the Account Agreement because Chase owed him no duty to discover the counterfeit check and the risk of loss remained with him because Chase never received final settlement for the counterfeit check." (Plaintiff's Memorandum of Law in Support of Summary Judgment, dated May 27, 2015 ("Pl.'s Mem. in Supp."), at 15.)

On June 29, 2015, Defendant filed a cross-motion for summary judgment, arguing, among other things, that "Chase is equitably estopped from charging back Freyberg's Account." (Def.'s Mem. of in Opp'n to Pl.'s Mot. for Summ. J. and in Supp. of Def.'s Cross–Mot. for Summ. J., dated July 29, 2015 ("Def.'s Mem. in Opp'n"), at 8.) "Chase alone possessed extensive information regarding the fact that

the transaction was likely fraudulent, which it withheld from Freyberg and then disregarded in recklessly allowing the wire to be sent prior to final collection of the Check." (*Id.*)

On July 20, 2015, Chase filed a reply. (Pl.'s Reply Mem. of Law in Supp., dated July 20, 2015 ("Pl.'s Reply"), at 2.) On August 10, 2015, Freyberg filed a reply. (Def.'s Reply Mem. of Law in Supp., dated Aug. 10, 2015 ("Def.'s Reply"), at 4.) It was agreed that the parties' motions would be decided "on submission." (*See* Tr., dated Apr. 13, 2015, at 7:25–8:2.)

**For the reasons set forth below, Plaintiff's motion for summary judgment is granted, and Defendant's motion for summary judgment is denied.[3]**

## II. Legal Standard

"The UCC is clear that, until there is final settlement of the check, the risk of loss lies with the depositor." *Greenberg, Trager & Herbst, LLP v. HSBC Bank USA,* 17 N.Y.3d 565, 582, 934 N.Y.S.2d 43, 958 N.E.2d 77 (2011). "A collecting bank acts as the agent of its customer, and until such time as the collecting bank receives final payment, the risk of loss continues in the customer, the owner of the item." *Hanna v. First Nat. Bank of Rochester,* 87 N.Y.2d 107, 119, 637 N.Y.S.2d 953, 661 N.E.2d 683 (1995).

"If there is a policy implicit in the UCC's rules for the allocation of losses due to fraud, it surely is that the loss be placed on the party in the best position to prevent it." *Northpark Nat. Bank v. Bankers Trust Co.,* 572 F.Supp. 524, 535 (S.D.N.Y. 1983). A party is in the "best position to guard against the risk of a counterfeit check by knowing its 'client,' its client's purported debtor and the recipient of the

wire transfer." *Greenberg, Trager & Herbst, LLP v. HSBC Bank USA,* 73 A.D.3d 571, 572, 905 N.Y.S.2d 6 (N.Y.App. Div. 1st Dep't 2010) *aff'd,* 17 N.Y.3d 565, 958 N.E.2d 77, 934 N.Y.S.2d 43 (2011).

"A court may grant a motion for summary judgment when 'the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.' " *Fischer & Mandell LLP v. Citibank, N.A.,* 2010 WL 2484205, at *3 (S.D.N.Y. May 27, 2010) *aff'd,* 632 F.3d 793 (2d Cir.2011) (quoting FRCP 56(c)). When cross motions for summary judgment are made, the standard is the same as that for individual motions. *See Morales v. Quintel Entm't, Inc.,* 249 F.3d 115, 121 (2d Cir.2001). The court must consider each motion independently of the other and, when evaluating each, the court must consider the facts in the light most favorable to the non-moving party. *Morales,* 249 F.3d at 121.

## III. Analysis

### Chase is Entitled to Reimbursement from Freyberg in the Amount of $380,-221.01

Chase argues that "Defendant is liable for the overdraft as a matter of law . . . and the risk of loss remained with him because Chase never received final settlement for the counterfeit check." (Pl.'s Mem. in Supp. at 15.) Freyberg counters that Chase is equitably estopped from charging back Freyberg's account for $380,221.01 because "Chase would have prevented the loss had it (a) disclosed the information in its possession to Freyberg regarding, *inter alia,* the likely fraud;

---

**3.** Any issues raised by the parties not specifically addressed herein were considered by the Court on the merits and rejected.

and/or (b) not altered the hold which it [had] placed on the wire transaction." (Def.'s Mem. in Opp'n at 12.)

The Court finds that Plaintiff is entitled to reimbursement of the $380,221.01 overdraft in Freyberg's business checking account. *See The Canandaigua Nat. Bank & Trust Co. v. Palmer,* 39 Misc.3d 1211(A), 969 N.Y.S.2d 801 (City Ct.2013) ("It is well settled under both common law and the UCC that a bank has a legitimate right to recover overdrafts from a customer."). Under UCC § 4–212, "[i]f a collecting bank [*i.e.,* Chase] has made a provisional settlement with its customer [*i.e.,* Freyberg] for an item and itself fails by reason of dishonor ... to receive a settlement of the item which is or becomes final, **the bank may revoke the settlement given by it, charge back the amount of any credit given for the item to its customer's account or obtain a refund from the customer.**" UCC § 4–212(1) (emphasis added).

The UCC is clear that, until there is a final settlement of the check, the risk of loss lies with the depositor. *See Greenberg, Trager,* 17 N.Y.3d at 582, 934 N.Y.S.2d 43, 958 N.E.2d 77 (granting bank's motion for summary judgment against law firm); *Hanna,* 87 N.Y.2d at 119, 637 N.Y.S.2d 953, 661 N.E.2d 683 ("A collecting bank acts as the agent of its customer, and until such time as the collecting bank receives final payment, the risk of loss continues in the customer, the owner of the item.").

 There was never a final settlement of the Counterfeit Check. Final settlement is made "when the check is finally paid by the payor bank," here, Bank of New York. *See Call v. Ellenville Nat. Bank,* 5 A.D.3d 521, 523, 774 N.Y.S.2d 76 (N.Y.App.Div. 2d Dep't 2004). Bank of New York determined that the $433,567.60 check was counterfeit and refused to pay Chase. (*See* Glickman Decl., Ex. 21.)

Consequently, Chase "never received settlement for the [ ] check, and its right of charge-back or refund did not terminate." *See Roslyn Sav. Bank v. Jude Thaddeus Glen Cove Marina, Inc.,* 266 A.D.2d 198, 199, 697 N.Y.S.2d 333 (N.Y.App.Div. 2d Dep't 1999); *see also Call,* 5 A.D.3d at 524, 774 N.Y.S.2d 76 ("[W]hen final settlement was not made on the check by the payor bank due to discovery of the counterfeit, the [collecting] bank was entitled to revoke the provisional settlement made on the check and charge back [defendant's] account or obtain a refund from [defendant] for the funds drawn on the check."); *Margot J. Garant, Inc. v. Suffolk Cty. Nat. Bank,* 46 Misc.3d 1218(A), 17 N.Y.S.3d 383 (N.Y.Sup.Ct.2015) (where bank charged-back attorney's checking account after check was determined to be counterfeit, and the Court held "the collecting bank has the right to charge back the amount if the check is dishonored or the bank fails to receive a settlement for the check."); *Bank of New York v. Asati, Inc.,* 184 A.D.2d 443, 585 N.Y.S.2d 411, 412 (1992). By permitting Freyberg access to funds on a provisional basis, subject to the right of a charge-back and refund, Chase was merely following "a practice that is common in the banking industry." *Fischer & Mandell, LLP,* 632 F.3d 793, 801 (2d Cir.2011) (affirming the granting of bank's motion for summary judgment against law firm).

### No Equitable Estoppel

 Freyberg's argument that Chase is equitably estopped from charging back Freyberg's account is without merit. *See, e.g., Greenberg, Trager,* 17 N.Y.3d at 581–82, 934 N.Y.S.2d 43, 958 N.E.2d 77. "Equitable estoppel is an extraordinary remedy." *See Nasso v. Bio Reference Labs., Inc.,* 892 F.Supp.2d 439, 449 (E.D.N.Y. 2012). "Under New York law, the doctrine should be invoked sparingly and only under exceptional circumstances." *Twer-*

*sky v. Yeshiva Univ.*, 993 F.Supp.2d 429, 442 (S.D.N.Y.) *aff'd*, 579 Fed.Appx. 7 (2d Cir.2014).

In order to establish a claim of equitable estoppel, Freyberg must show "(1) lack of knowledge and of the means of the true facts; (2) reliance upon the conduct of the party to be estopped; and (3) prejudicial change in [his] position." *In re Vebeliunas*, 332 F.3d 85, 94 (2d Cir.2003); *see also Randolph Equities, LLC v. Carbon Capital, Inc.*, 648 F.Supp.2d 507, 524 (S.D.N.Y.2009). The record demonstrates overwhelmingly that Freyberg has failed to show a lack of knowledge or reasonable reliance on the conduct of Chase, as shown below.

**Freyberg Did Not Lack Knowledge of the True Facts; Numerous "Red Flags"**

The record is replete with examples of Freyberg—in the fact of numerous "red flags" of the Counterfeit Check scam—acting in complete and reckless disregard to the "true facts." Freyberg acted in haste and he failed to investigate in any meaningful way the *bona fides* of his 'client' (or his client's purported debtor, Praxair), who approached Freyberg literally out of the blue (*see supra* pp. 180–81). Freyberg exercised no caution before insisting that Chase wire $389,950.00 from his business checking account to a virtual stranger, even after learning from Chase that "checks within this deposit may not be paid." *See Kevin Kerveng Tung, P.C. v. JP Morgan Chase & Co.*, 34 Misc.3d 1209(A), 2011 WL 6989895, at *5 (N.Y.Sup. Ct. Oct. 28, 2011) *aff'd*, 105 A.D.3d 709, 963 N.Y.S.2d 145 (2013) (granting bank's motion to dismiss against law firm). In addition, Freyberg's failure to investigate enabled the scam to succeed. "[W]hen innocent parties [*i.e.*, Freyberg and Chase] suffer from the acts of a third person [*i.e.*, perpetrator of the email "scam"], the party that enabled the third person [*i.e.*,

Freyberg] must bear the loss." *Greenberg, Trager*, 17 N.Y.3d at 581, 934 N.Y.S.2d 43, 958 N.E.2d 77; *see also Kevin Kerveng Tung, P.C.*, 2011 WL 6989895, at *5.

Here are some of the many "red flags" that Freyberg seemingly ignored. Freyberg's retainer agreement, dated March 3, 2014, was sent to Zerhouni and stated that "[a] retainer and minimum fee in the amount of $5,000.00 shall be required in connection with this retention." (*See* Glickman Decl., Ex. 6.) However, when Zerhouni sent Freyberg a copy of the signed retainer agreement on March 3, 2014, he provided no retainer fee. (*Id.*, Ex. 7.) Instead, Zerhouni stated that "[w]e will inform you shortly on when we will remit the Retainer Agreement Fee." (*Id.*) On March 4, 2014, after Johns indicated that Praxair would send a settlement check, Freyberg again contacted Zerhouni and requested that he "please indicate when I can expect to receive the retainer fee set forth in the agreement we signed yesterday." (*Id.*, Ex. 10.) In response, Zerhouni instructed Freyberg to "deduct the retainer fee and any other fee incurred" from the $433,567.60 settlement check. (*Id.*, Ex. 11.) Testimony from Freyberg's March 2, 2015 deposition highlights this suspicious series of communications:

[Q—Pl.'s Counsel]: In the course of your practice from 1986 through March of 2014, had you ever taken your retainer from settlement proceeds you collected on behalf of a client [as opposed to receiving the fee separately and up-front]?

[A—Freyberg]: Settlement proceeds, no.

[Q—Pl.'s Counsel]: So this would have been the first time that happened?

[A—Freyberg]: I believe so. I can't recall another instance.

(Dep. Tr. of Mark Freyberg, dated March 2, 2015 ("Freyberg Dep."), (at 89:16–24).)

Also, when Freyberg was first contacted by Styrud on February 26, 2014, he seemingly ignored the fact that the email he received was sent from an "@outlook.com" email address, and not an "@diamyd.com" email address. (*See* Glickman Decl., Ex. 5.) And, although Styrud's email claimed that Diamyd "was referred to [Freyberg's] firm by A member of American Bar Association [sic]," (*Id.*, Ex. 5), Freyberg failed to "reach out to the American Bar Association to find out who referred [him]," and failed to consider that he was not a member of the American Bar Association. (*See* Freyberg Dep. At 29:20–30:2.) When Freyberg received a second email from Styrud on February 28, 2014, he failed to observe that the email was sent from a "@diiamyd.com" email address, which included a misspelling, *i.e.*, an extra "i" in the name Diamyd. (Glickman Decl., Ex. 5.) Emails from Zerhouni to Freyberg were also sent from an "@diiamyd.com" [sic] email address. (*Id.*, Ex. 8.) Freyberg also failed to recognize that John's email address was purportedly "@praxaircorp.com." (*Id.*, Ex. 9.) The company's actual name is "Praxair, Inc.," and its official email address is "@praxair.com." (*Id.*)

Freyberg also expended little or no effort in researching the two companies, Diamyd and Praxair. According to Freyberg's testimony during his March 2, 2015 deposition:

[Q—Pl.'s Counsel]: When you received this [February 26, 2014] email, what did you do next?

[A—Freyberg]: I did a number of things. I Googled the name of the company, Diamyd Medical. I went to their website. I saw that somebody whose name appeared on this e-mail appeared on the website with the same title, and I wrote back [purportedly to Styrud].

[Q—Pl.'s Counsel]: Okay, did you perform any type of Lexis or Westlaw search ... concerning Diamyd or the individual identified in this e-mail, Anna Styrud?

[A—Freyberg]: I did not.

(Freyberg Dep. at 29:5–19.)

[Q—Pl.'s Counsel]: Other than running a Google search ... did you do any other due diligence concerning Praxair?

[A—Freyberg]: I reviewed the website, Praxair's website. Moving shortly later in time, I confirmed the logo which appeared on a letter I received in the U.S. mail, purportedly from Praxair, had the same logo on the letterhead as appeared on the web page of the actual company.

[Q—Pl.'s Counsel]: And other than that, what other due diligence did you do concerning Praxair?

[A—Freyberg]: Nothing else concerning Praxair that I recall.

[Q—Pl.'s Counsel]: Did you run a Lexis or Westlaw search on Praxair?

[A—Freyberg]: No.

[Q—Pl.'s Counsel]: **Okay, did you check any of the attorney fraud websites to see whether Praxair or Diamyd were listed on any of those sites?**

[A—Freyberg]: **No.**

(Freyberg Dep., at 42:4–24) (emphasis added.)

Freyberg's March 2, 2015 deposition testimony further illustrates that he made no effort to contact the parties (in person) who were purportedly sending him email correspondence:

[Q—Pl.'s Counsel]: Did you ever attempt to telephone Ms. Styrud?

[A—Freyberg]: No.

(Freyberg Dep. at 37:18–20).

[Q—Pl.'s Counsel]: [D]id you attempt to telephone Diamyd, anyone at Diamyd?

[A—Freyberg]: No.

(*Id.* at 38:13–15).

[Q—Pl.'s Counsel]: Prior to expressing your concerns to Mr. Szygiel had you attempted to contact Mr. Zerhouni to ask him about any of this?

[A—Freyberg]: No.

[Q—Pl.'s Counsel]: Had you attempted to contact your [purportedly new] client, the client representative, Ms. Styrud, to ask her about any of this?

[A—Freyberg]: No.

[Q—Pl.'s Counsel]: Had you attempted to contact Ms. John at Praxair to ask her about any of this?

[A—Freyberg]: No.

(*Id.* at 198:12–22).

[Q—Pl.'s Counsel]: Did it strike you as odd that within that time frame this company was already able to tell Diamyd that they were going to send a cashier's check for that specific amount [of $433,567.60]?

[A—Freyberg]: **As I testified, it did seem like a short amount of time for a case to be on the path to resolution.**

[Q—Pl.'s Counsel]: Did you attempt to contact Ms. Styrud or Mr. Zerhouni after receiving this e-mail to discuss this with them by telephone?

[A—Freyberg]: No.

(*Id.* at 87:18–89:5) (emphasis added.)

[Q—Pl.'s Counsel]: [D]id you ever ask Praxair whether they were represented by counsel?

[A—Freyberg]: No, I did not.

[Q—Pl.'s Counsel]: Okay, did you ever ask them or have, either by e-mail or by telephone, what are we going to do

about [the] settlement agreement, who is drafting it?

[A—Freyberg]: I don't recall that.

[Q—Pl.'s Counsel]: Did you ever have any communication with Praxair about a release, who is drafting it, what's it going to say?

[A—Freyberg]: I don't recall that.

(*Id.* at 99:8–20.)

Instead of recognizing these "red flags" and proceeding with caution, Freyberg pressured Chase on more than one occasion to release the holds placed on the deposited $433,567.00 Counterfeit Check and the $389,950.00 wire request. On March 11, 2014, after receiving a transaction summary from Chase that indicated "Checks within this deposit may not be paid because of information we received from the paying bank or due to information we have within our systems," (Neufeld Aff., Ex. D.), Freyberg left a message for a Chase banking manager requesting that "somebody explain to me what the long delay was. My understanding was that I had deposited a bank check that should be [ ] cashed immediately." (Freyberg Dep. at 157:17–20). On March 12, 2014, Freyberg emailed Zerhouni with a copy of the Chase transaction summary, and stated "You will note on the slip that the bank is stating that the funds will be available on March 20. **However, I have placed a call to a manager at the bank and expressed my view that this is an unduly long waiting period.**" (Glickman Decl., Ex. 14) (emphasis added.) After Zerhouni responded "[p]lease ask your bank to make funds available before the given date. . . . Please do your best and ensure our funds is [sic] being available for wire before the given date," Freyberg replied "**I am doing my best in that regard,** as I indicated in my email." (*Id.*, Ex. 16) (emphasis added).

On March 13, 2014, Zerhouni emailed Freyberg instructions to "wire [ ] to our

creditor: Tanaka Isseidon Gaishon the sum of \$389,950.00." (*Id.*, Ex. 15.) Not only did Freyberg ignore the introduction of an entirely new, foreign bank, but he also ignored the "red flags" inherent in Zerhouni s instructions that "**[d]ue to the time difference between us, we want you to have this transfer executed today before 12:30 your time and make the value date of the transfer 13**<sup>th</sup> **March . . .**" (*Id.*) (emphasis added.) After Chase placed a hold on Freyberg's March 13, 2014 request to wire \$389,950.00, Freyberg visited Chase's Chappaqua branch in order to request that Chase release the hold on the wire:

> [Q—Pl.'s Counsel]: Mr. Freyberg, he asked you specifically to have the wire transfer released?
>
> [A—Szygiel]: Yes. ·

(*See*, Dep. Tr. of Joseph Szygiel, dated Feb. 20, 2015 ("Szygiel Dep."), at 66:11–17.) (emphasis added).

In fact, had Freyberg made (even) a single telephone call to the parties, he likely would have discovered that he was participating in a scam:

> [Q—Pl.'s Counsel]: When you received this check . . . drawn by a Canadian bank [Canadian Imperial Bank of Commerce], did that strike you as odd?
>
> [A—Freyberg]: **It surprised me.**
>
> [Q—Pl.'s Counsel]: How so?
>
> [A—Freyberg]: **Because there had been no Canadian connection in this matter in any way.**
>
> [Q—Pl.'s Counsel]: Did you attempt to contact Ms. John to ask her why she was sending you a check drawn by a Canadian bank?
>
> [A—Freyberg]: **If only I had.**

(*Id.* at 118:21–119:7) (emphasis added.)

> [A—Freyberg]: [A]fter I saw that the check had been dishonored [by Chase], I called Praxair and sought to reach Vanessa John herself who had purported to send the check and had been involved in the transaction. I did not get her on the phone, but I spoke to her assistant.
>
> [Q—Pl.'s Counsel]: And what did you ask her assistant?
>
> [A—Freyberg]: I said to her assistant that I was an attorney in New York City and I received a Praxair check that had been dishonored and I would like to speak to Vanessa John about it.
>
> [Q—Pl.'s Counsel]: And what did this assistant respond to you?
>
> [A—Freyberg]: **She responded to me, can you tell me what the check was about? And I gave her a brief description of the supposed transaction and she told me she was very familiar with this dynamic, or set of facts . . . [and] [t]hat she received calls on a regular basis from attorneys who indicated they had received checks with the Praxair name on it and it was part of, a known to the assistant and known to Praxair, scam.**

(Freyberg Dep. at 45:19–46:21) (emphasis added.)

**Freyberg also acknowledged that it was only "after [he] learned the whole thing was a scam [that he] started looking hard at all the relevant information."** (*Id.* at 217:8–10) (emphasis added.)

Freyberg's categorical failure to investigate or act on these red flags enabled the success of the scam, and he must bear the loss incurred. *See Greenberg, Trager,* 17 N.Y.3d at 581, 934 N.Y.S.2d 43, 958 N.E.2d 77 (finding that law firm "was in the best position to guard against the risk of a counterfeit check . . . [but instead] expended scant effort at researching any of [the clients], and engaged in the subject transaction pursuant to the client's exhortation to act 'ASAP' and that time was of the essence."); *see also Kevin Kerveng Tung, P.C.,* 2011 WL 6989895, at \*5 ("[Attorney]

was in the best position to protect itself from a fraudulent check cashing scheme, by knowing its 'client', and exercising caution before wiring funds ... [and] may not shift the losses it incurred as a result of said scheme onto the [Banks].").

**Freyberg's Reliance on Chase was Not Reasonable**

 In order to demonstrate "reasonable reliance" on any alleged misrepresentations by Chase, Freyberg must show " 'minimal diligence' or care that 'negat[es] [his] own recklessness.' " *See St. Paul Mercury Ins. Co. v. M & T Bank Corp.*, 2014 WL 641438, at *5 (S.D.N.Y. Feb. 19, 2014); *see also Amusement Indus., Inc. v. Buchanan Ingersoll & Rooney, P.C.*, 2013 WL 628533, at *12 (S.D.N.Y. Feb. 15, 2013). Freyberg ignored numerous "red flags" that he was taking part in a Counterfeit Check scam. (*See supra* pp. 186–90.) He failed to conduct even "minimal diligence" in investigating his client or his client's purported debtor. (*Id.*) Because Freyberg has failed to demonstrate "minimal diligence or care that negates his own recklessness," *St. Paul Mercury Ins.*, 2014 WL 641438, at *5, he cannot show any detrimental reliance which was reasonable under the circumstances. *See Levine v. Greece Cent. Sch. Dist.*, 353 Fed.Appx. 461, 464 (2d Cir.2009); *see also Banque Franco–Hellenique de Commerce Int'l et Mar., S.A. v. Christophides*, 106 F.3d 22, 26 (2d Cir.1997) ("While the law does not require that a defrauded party go to the ends of the earth to discover the falsity of a statement, patent foolishness is not excused.").

Even assuming, *arguiendo*, that Freyberg had conducted "minimal diligence or

care" (which he had not), he likely would not be able to demonstrate reasonable reliance. According to Freyberg, Chase relationship banker Szygiel allegedly stated that "the funds were unquestionably in my [Freyberg's] account to send this wire out." [4] (*See* Freyberg Dep. At 192:6–8.). New York courts have found that alleged oral statements such as "the check had 'cleared,' " or "the funds are available" to be "ambiguous remark[s] that may have been intended to mean only that the amount of the check was available (as indeed it was)." *See Greenberg, Trager*, 17 N.Y.3d at 580, 934 N.Y.S.2d 43, 958 N.E.2d 77; *see also Fischer*, 632 F.3d at 799 (" '[A]vailable' meant only that account balances were 'available' for use on a provisional basis, subject to a charge back if a check was returned, and not that the account balance represented collected funds."). Reliance on this statement as assurance that final settlement had occurred was, under the circumstances here, "unreasonable as a matter of law." *Id.*; *see also Margot J. Garant*, 17 N.Y.S.3d at *6–7* ("**The Court of Appeals, the Second Circuit, and the Second Department have all declined to unsettle the statutory allocation of risk of loss ... and have rejected claims of reliance on statements by banks, either expressed or implied, that funds were 'available' or had 'cleared.' ")** (emphasis added).

*Defendant's Counterclaims*

**(1) Counterclaim of Negligent Misrepresentation Fails**

Defendant contends that, when "Chase released the wire on March 14 and Szygiel

---

4. Chase adamantly disagrees with this characterization of Freyberg's conversation with Szygiel, arguing that "Defendant admits that neither Mr. Szygiel nor any representative of Chase ever told him that Chase received 'final settlement' or 'final payment' for the Counterfeit Check." (Pl.'s Mem. in Supp. at 12)

(quoting Freyberg Dep. at 232:13–15; 23:5–6; 234:17–18; 242:5–6) (Freyberg: "I don't recall specific use of those words ... I don't recall the exact words he used ... I don't recall the specific language or words that [Mr. Szygiel] used that day ... ")

[the Chase banker to whom Freyberg complained following Chase's hold on the March 13, 2014 wire request] informed Freyberg that Chase's concerns had been addressed and that the funds were in his account, Freyberg could (and did) reasonably rely on the facts that the funds were in his account and not merely 'available.'" (Def.'s Mem. in Opp'n at 15–16, 18.) Plaintiff counters that "*Greenberg, Trager* held that a bank and its customer are in a borrower-lender relationship, and a bank owes no special duty to its customer." (Pl.'s Mem. in Supp. at 20) (citing *Greenberg, Trager,* 17 N.Y.3d at 578–79, 934 N.Y.S.2d 43, 958 N.E.2d 77.)

Under New York law, "[a] claim for negligent misrepresentation requires the plaintiff to demonstrate (1) the existence of a special or privity-like relationship imposing a duty on the defendant to impart correct information to the plaintiff; (2) that the information was incorrect; and (3) reasonable reliance on the information.'" *Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.,* 2013 WL 837536, at *3 (S.D.N.Y. Mar. 6, 2013) (quoting *Mandarin Trading Ltd. v. Wildenstein,* 16 N.Y.3d 173, 919 N.Y.S.2d 465, 470, 944 N.E.2d 1104 (2011)).

### No Special Relationship

Freyberg has failed to establish the existence of a 'privity-like' relationship required to assert a claim of negligent misrepresentation. *See Levantino v. Starwood Mortgage Capital LLC,* 2015 WL 7430860, at *5 (S.D.N.Y. Nov. 20, 2015). For one thing, "[t]he relationship between a bank and its depositor is that of debtor and creditor, which, without more, is not a fiduciary or special relationship." *Kevin Kerveng Tung, P.C.,* 943 N.Y.S.2d 792, at *5. For another, courts applying

New York law have been skeptical of efforts to hold banks liable for negligently misrepresenting the status of funds to a customer. *See JP Morgan Chase Bank, N.A. v. Cohen,* 26 Misc.3d 1215(A), 907 N.Y.S.2d 101 (Sup.Ct.2009) (listing cases). Essentially, "an arm's length borrower-lender relationship does not support a cause of action for negligent misrepresentation... even if there is a long-standing relationship between the customer and a particular bank employee or if the parties are familiar or friendly." *Levantino,* 2015 WL 7430860, at *5 (quoting *Greenberg, Trager,* 17 N.Y.3d at 578, 934 N.Y.S.2d 43, 958 N.E.2d 77); *see also Margot J. Garant,* 17 N.Y.S.3d at *5.

### No Reasonable Reliance

Even assuming, *arguendo,* that privity were shown, Freyberg likely could not establish that he "reasonably relied" on any alleged misrepresentations by Chase. As noted *supra* pp. 190–91, alleged oral statements that "the funds were unquestionably in my [Freyberg's] account to send this wire out," (*See* Freyberg Dep. at 192:6–8.), are considered "ambiguous remark[s] that may have been intended to mean only that the amount of the check was available (as indeed it was)." *See Greenberg, Trager,* 17 N.Y.3d at 580, 934 N.Y.S.2d 43, 958 N.E.2d 77; *see also Margot J. Garant,* 17 N.Y.S.3d at *6–7.[5]

Defendant's motion for summary judgment on his counterclaim of negligent misrepresentation is denied.

### (2) Counterclaim of Fraudulent Misrepresentation Fails

Defendant argues that Chase failed to confirm whether the Counterfeit Check had been paid and "released the

---

5. Having found that Freyberg cannot demonstrate "privity" or "reasonable reliance," the Court need not reach the remaining element of negligent misrepresentation. *See Margot J. Garant,* 17 N.Y.S.3d 383, at *6.

protective hold without disclosing to Freyberg that the conditions precedent to the release had never occurred; instead informing Freyberg that the bank's concerns had been fully addressed and that funds were in his account." (Def.'s Mem. in Opp'n at 19.) Plaintiff counters that "it is unreasonable as a matter of law for a depositor to rely on alleged statements that a check has 'cleared' as assurance that the bank received final settlement for it." (Pl.'s Mem. in Supp. at 20–21.)

▮ Under New York law, in order to state a claim for fraudulent misrepresentation, "a plaintiff must show that (1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance." *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 186–87 (2d Cir. 2004); *see also Rana v. Islam*, 305 F.R.D. 53, 58 (S.D.N.Y.2015).

Reasonable reliance is an essential element of both fraud and negligent misrepresentation. *See Margot J. Garant*, 17 N.Y.S.3d at *7. As noted *supra* pp. 191–92, Defendant's reliance on Chase's statement as assurance that final settlement of the Counterfeit Check had occurred was, under the circumstances here, unreasonable as a matter of law. *See Greenberg, Trager*, 17 N.Y.3d at 580, 934 N.Y.S.2d 43, 958 N.E.2d 77.[6]

Defendant's motion for summary judgment on his counterclaim of fraudulent misrepresentation is denied.

### (3) Counterclaim of Violation of the Expedited Funds Availability Act Fails

As discussed *supra* p. 182, soon after Freyberg deposited the $433,567.00 Counterfeit Check on March 11, 2014, he received a transaction summary from Chase that stated "checks within this deposit may not be paid because of information we've received from the paying bank or due to information we have within our systems." (*See* Neufeld Aff., Ex. D.) Defendant contends that "Section 4010 of the EFAA imposes civil liability upon a bank which does not comply with the [notice] requirements of the EFAA," and the March 11, 2014 Chase transaction summary "provided no indication of the facts upon which Chase based its determination to delay fund availability" to Freyberg.[7] (Def.'s Mem. in Opp'n at 20.) Plaintiff counters that "the EFAA does not impose liability on a bank for its customer's checks." (Pl.'s Reply at 7.)

▮ Courts have uniformly held that "the EFAA does not make banks liable for their customers' checks. Customers of banks ... withdraw money early at their own peril. EFAA requires institutions to make the funds available, but it does not require a bank to effectively become a guarantor of the check in the process." *Fischer & Mandell LLP v. Citi-*

---

6. Having found that Freyberg cannot demonstrate the element "reasonable reliance," the Court need not reach other elements of fraudulent misrepresentation. *See Margot J. Garant*, 17 N.Y.S.3d 383, at *6.

7. Section 4003 of the EFAA states that "cash or funds [including checks] shall be available for withdrawal on the business day after the business day on which such cash or funds are deposited," but creates an exception where the bank has "has reasonable cause to believe that the check is uncollectible." 12 U.S.C. § 4003(c). Section 4003 states that a "reasonable cause to believe requires the existence of facts which would cause a well-grounded belief in the mind of a reasonable person. Such reasons shall be included in the notice required under subsection (f) of this section." *Id.*

*bank, N.A,* 2009 WL 1767621, at *5–6 (S.D.N.Y. June 22, 2009) (granting bank's motion for summary judgment against law firm where bank sought reimbursement for funds wired ($182,780) following a $225,351 counterfeit check deposit) (quoting *Lynch v. Bank of America, N.A.,* 493 F.Supp.2d 265 (D.R.I.2007)). "The language of the statute is clear and creates no exception for cases in which the bank makes inaccurate assurances or outright misrepresentations regarding the account." *Denkewalter & Associates, Ltd. v. Cole Taylor Bank,* No. 10 CV 4899, 2011 WL 3164460, at *5 (N.D.Ill. July 27, 2011); *see also Beffa v. Bank of W.,* 152 F.3d 1174, 1178 (9th Cir.1998) ("[I]ntentional and negligent misrepresentation claims . . . involve elements that are beyond the scope of EFAA. **While EFAA governs a bank's actions in making deposited funds available to its customers, it does not cover erroneous representations by the bank concerning the status of a transaction.**") (emphasis added).

Defendant's motion for summary judgment on his counterclaim of violation of the EFAA is denied. *See Fischer,* 2009 WL 1767621, at *5–6; (*see also Lynch,* 493 F.Supp.2d at 268 (quoting 12 U.S.C. § 4006(c)(2)(C)) ("EFAA clearly states that none of its provisions shall be construed as limiting a bank's right 'to charge back the depositor's account for the amount of [the] check.' ")).

#### (4) Counterclaim of Violation of Uniform Commercial Code Fails

Defendant contends that Chase acted in bad faith under the UCC by "failing to exercise ordinary care in handling an item [*i.e.,* the Counterfeit Check]," (Def.'s Mem. in Opp'n at 21), and by "concealing that it was releasing uncollected funds and had concluded the transaction was likely fraudulent," (Def.'s Reply at 8–9). Plaintiff counters that "[t]he UCC mandates that the risk of loss remains with the depositor

until the bank receives final settlement for the check . . . [it] cannot be a 'bad faith' violation of the UCC for a bank to honor its customer's instructions to send a wire the customer knew to be funded by a provisional credit to his account." (Pl.'s Reply at 8.)

As noted *supra* p. 184–85, the UCC is clear that, until there is final settlement of the check, the risk of loss lies with the depositor. *See Greenberg, Trager,* 17 N.Y.3d at 582, 934 N.Y.S.2d 43, 958 N.E.2d 77. In this case, Chase never received settlement for the Counterfeit Check, and therefore "the risk of loss continues in the customer [*i.e.,* Freyberg], the owner of the item." *See Hanna,* 87 N.Y.2d at 119, 637 N.Y.S.2d 953, 661 N.E.2d 683; *see also Northpark Nat. Bank,* 572 F.Supp. at 535 ("If there is a policy implicit in the UCC's rules for the allocation of losses due to fraud, it surely is that the loss be placed on the party in the best position to prevent it."); *Morgan Guarantee,* 590 F.Supp. at 1139; *Chase v. Morgan Guarantee Trust Co.,* 590 F.Supp. 1137, 1139 (S.D.N.Y.1984) (granting bank's motion for summary judgment against attorney where bank sought reimbursement after law firm deposited a $100,000 counterfeit check).

### IV. Conclusion & Order

For the foregoing reasons, Plaintiff's motion for summary judgment [# 47] is granted and Defendant's cross-motion for summary judgment is denied [# 54].

The amount of pre-judgment interest Plaintiff may be entitled to will be determined after Plaintiff has submitted a letter application with authorities and Defendant has the opportunity to respond. *See In re Livent, Inc.,* 360 F.Supp.2d 568, 570 (S.D.N.Y.2005). Plaintiff shall file a letter motion seeking any pre-judgment interest within one (1) week of the date of this Decision and Order, and Defendant may

submit a letter response within five (5) days of the date of Plaintiff's letter application.