Filed 4/9/26

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

|  |  |
|---|---|
| Y.P.,<br><br>    Plaintiff and Appellant,<br>    v.<br><br>WELLS FARGO COMPANY et al.,<br><br>    Defendants and Respondents. | A172048<br><br>(City and County of San Francisco Super. Ct. No. CGC24613065) |

Plaintiff Y.P., an attorney and the sole proprietor of a law firm, fell victim to an unfortunately common check fraud scam, in which a purported client provided Y.P. with a check and subsequently instructed Y.P. to wire transfer a portion of the funds before his bank identified that the check was fraudulent.  After the check was dishonored, the bank charged back the deposited funds from Y.P.'s account, causing him to bear the loss of the wired funds.

Y.P. challenges the judgment entered after the trial court sustained demurrers to each of his claims against defendants Wells Fargo & Company and Wells Fargo Bank, N.A. (together, Wells Fargo) and Earl Ignacio, a Wells Fargo employee (collectively, defendants). Y.P. contends he properly alleged causes of action for breach of contract, breach of implied covenant of good faith and fair dealing, negligent misrepresentation, and negligent hiring, supervision, and retention.

We conclude Y.P.'s complaint adequately stated a cause of action for negligent misrepresentation because it alleged that Ignacio represented to Y.P. that the check was not fraudulent, despite lacking a reasonable basis for doing so. However, we also conclude that Y.P.'s complaint failed to adequately state the asserted causes of action for breach of contract, breach of the implied covenant, and negligent hiring, supervision, and retention. Finally, we conclude that the trial court did not abuse its discretion in ruling that Y.P. could not cure the defects with those causes of action via amendment. Accordingly, we reverse the judgment of dismissal, and the order sustaining Wells Fargo's demurrer is reversed in part and affirmed in part.

## I. BACKGROUND

In accord with the governing standard of review, we treat well pleaded factual allegations contained in Y.P.'s complaint as admitted by Wells Fargo's demurrer. (*Hoffman v. Smithwoods RV Park, LLC* (2009) 179 Cal.App.4th 390, 400 (*Hoffman*).) However, we also consider judicially noticed facts and documents attached to the complaint. (*Ibid.*) Y.P.'s complaint alleged, and the documents annexed to the complaint disclose, the following facts.

### A. Y.P's Agreement with Wells Fargo

Y.P. is a lawyer and the sole proprietor of a law firm. To set up an Interest on Lawyers Trust Account (IOLTA) to hold client funds, Y.P. submitted a Business Account Application (the BAA) with Wells Fargo. Wells Fargo accepted the application and opened the requested account, which is governed by the terms of Wells Fargo's Deposit Account Agreement (the DAA).

Regarding deposits, the DAA provides that Wells Fargo "exercise[s] ordinary care when collecting a deposited item" but warns

that Wells Fargo is "not responsible for any other bank's treatment or loss of the item" and admonishes that it is the customer's "responsibility, not ours, to confirm the accuracy of the amount you deposit." It further states that Wells Fargo does not "verify all transactions but [has] the right to verify any. . . . [Wells Fargo] may reverse or adjust, at any time without prior notice to you, any debit or credit [Wells Fargo] believe[s] [Wells Fargo] have made to your account by mistake."

Moreover, if a customer deposits an item that "is returned to [Wells Fargo] unpaid," the DAA provides that "[Wells Fargo] can deduct the amount from any account you have with [Wells Fargo]. [Wells Fargo] can do this when [Wells Fargo is] notified that the item will be returned and [Wells Fargo doesn't] need to receive the actual item. [Wells Fargo] can do this even if the balance in your account isn't sufficient to cover the amount we hold or deduct, causing an overdraft. In addition, [Wells Fargo will] charge you all applicable fees and reverse all interest accrued on the item."

The next section of the DAA concerns Wells Fargo's policy for the availability of funds. It provides that Wells Fargo's "policy is to make funds from your check deposits to your checking or savings account . . . available to you on the first business day after the day we receive your deposits." "Once [funds] are available, you can withdraw the funds . . . ." However, the DAA specifies circumstances under which Wells Fargo may delay the availability of deposited funds, including if Wells Fargo thinks a check will be unpaid or a customer deposits more than $5,525 in a day. If the availability of funds is delayed, the DAA states that Wells Fargo "will tell you when the funds will be available."

3

Under a provision titled "Protecting Your Account and Your Information," the DAA states that each customer "agree[s] to take reasonable steps to ensure the integrity of [the customer's] account and items drawn or deposited to it." It then supplies several "recommend[ed]" steps customers should take, including: "Don't deposit checks from people whom you don't know. Fraudsters often request that you deposit a fake check into your account, then request that you return some of the funds. After you return the funds, the check bounces, but you are still responsible to [Wells Fargo] for the full amount of the check you deposited." Business customers who "decide not to implement or use the recommended service or industry best practice or . . . fail to use it in accordance with the applicable service description or our other applicable documentation . . . are responsible for all losses that could have been prevented or mitigated by correct use of the recommended service or best practice." The DAA also lists services that Wells Fargo provides "to help prevent fraud on analyzed business accounts." The specified services are: "Positive pay, positive pay with payee validation, or reverse positive pay[;] [¶] ACH fraud filter, and[;] [¶] Payment Authorization service."

Separately, the DAA lays out "[r]esponsibilities and liabilities between Wells Fargo and [the customer]." It provides, in relevant part: "[Wells Fargo is] responsible for exercising ordinary care and complying with this Agreement. [¶] When [Wells Fargo] take[s] an item for processing by automated means, ordinary care does not require [Wells Fargo] to examine the item. In all other cases, ordinary care requires only that [Wells Fargo] follow[s] standards that don't vary unreasonably from the general standards followed by similarly situated

4

banks. [¶] Except to the extent [Wells Fargo] fail[s] to exercise ordinary care or to comply with this Agreement, you agree to indemnify and hold us harmless from all claims, demands, losses, liabilities, judgments, and expenses . . . arising out of or in any way connected with [Wells Fargo's] performance under this Agreement.  This indemnification will survive termination of this Agreement. [¶] [Wells Fargo] won't be liable for anything [Wells Fargo] do[es] when following your instructions."

## B.    The Fraudulent Check Scam

On an unspecified date, Y.P. received "what appeared to be a legitimate debt payment cashier's check in the amount of $99,700.00" from a "purported client."  The check was "purportedly issued by Falls City National Bank" and "written on behalf of 'Fastenal, Inc.' "  The check "ostensibly represented what [Y.P.] believed to be partial payment of a debt obtained as part of a legal matter being handled by [Y.P.] on behalf of [the] purported client."

On Friday, March 18, 2022, Y.P. deposited the check into the IOLTA account.[1]  On Monday, March 21, 2022, the client directed Y.P. to wire transfer $89,730 "as soon as the funds from the Check cleared" and to retain $9,970 as the legal fees for his services.

That same Monday, Y.P. called Wells Fargo "to inquire about the status of the deposited funds and confirm that the [c]heck was legitimate."  He spoke to bank employee Earl Ignacio, who "informed [Y.P.] that the [c]heck 'cleared' and directed [Y.P.] to come to the [b]ranch to perform the wire transfer of funds."  Y.P. went in person to

---

[1] We take judicial notice of the fact that March 18, 2022, was a Friday and March 21, 2022, was a Monday.  (*Hiner v. Olson* (1937) 23 Cal.App.2d 227, 235 ["A court will take judicial notice of the day of the week from the date as shown by the calendar"].)

5

the bank's local branch, where he again expressed "concerns . . . to Ignacio that the [c]heck may be fraudulent, and that he would like to make sure that the [c]heck cleared before he wire[d] the funds to his client." Y.P. asked Ignacio "something to the effect of 'Are you sure that I can wire the check?' Ignacio [replied] 'Yes, it is all good; it is cleared and good to go.' "

Y.P. then initiated the $89,730 wire transfer, which Wells Fargo duly processed.

The next day, Wells Fargo sent Y.P. a letter informing him that the cashier's check was returned as altered or fictitious. Wells Fargo charged back $99,700, deducting that sum from the balance in Y.P.'s IOLTA account. Y.P. "immediately attempted to contact the Wells Fargo . . . but no one responded."

Y.P. contacted Wells Fargo the next day, and Wells Fargo "assured [Y.P.] that [it] would promptly notify the recipient bank . . . of the fraudulent check and attempt to reverse the wire." The manager of the local branch later informed Y.P. that "the correct procedure for verifying whether a check is 'good' is to call the payor/issuing bank prior to doing the wire." A month later, Wells Fargo notified Y.P. that "it would no longer seek the return of his funds . . . and refused to repay him the same."

## C.    Y.P.'s Lawsuit Against Wells Fargo

Y.P. filed the underlying action against Wells Fargo, Ignacio, and his insurer.  Wells Fargo and Ignacio demurred to the complaint.[2]  Y.P. opposed.[3]

Before the scheduled hearing on the demurrer, the trial court issued a tentative ruling sustaining the demurrer.  After the hearing, the trial court adopted its tentative ruling, sustaining Wells Fargo's and Ignacio's demurrer without leave to amend.[4]  The court subsequently entered judgment in favor of Wells Fargo and Ignacio.

## II.    DISCUSSION

### A.    Demurrer

We review the sufficiency of a complaint against a general demurrer de novo.  (*Schifando v. City of Los Angeles* (2003) 31 Cal.4th 1074, 1081.)  In doing so, we give the complaint a reasonable interpretation, assuming the truth of properly pleaded or implied factual allegations but also considering judicially noticed facts and documents attached to the complaint.  (*Hoffman, supra,* 179 Cal.App.4th at p. 400.)  " 'Under the doctrine of truthful pleading, the courts "will not close their eyes to situations where a complaint contains allegations of fact inconsistent with attached documents, or

---

[2] Y.P.'s insurer filed its own demurrer to the initial complaint, and Y.P.'s claims against his insurer are not at issue in this appeal.

[3] Y.P. filed an opposition, an amended opposition, and a "second amended opposition" to the demurrer.  Wells Fargo and Ignacio also moved to strike portions of the complaint seeking attorneys' fees and punitive damages, which Y.P. opposed and followed up with an amended opposition and second amended opposition.

[4] Consequently, the trial court took the motion to strike off calendar as moot.

7

allegations contrary to facts which are judicially noticed." [Citation.] "False allegations of fact, inconsistent with annexed documentary exhibits [citation] or contrary to facts judicially noticed [citation], may be disregarded . . . ." ' " (*Edgerly v. City of Oakland* (2012) 211 Cal.App.4th 1191, 1198; see *Schmier v. City of Berkeley* (2022) 76 Cal.App.5th 549, 553, fn. 4 [" ' "Facts appearing in exhibits attached to the . . . complaint also are accepted as true and are given precedence, to the extent they contradict the allegations" ' "].)

If the trial court sustained the demurrer without leave to amend and we conclude that the complaint does not state a cause of action, "we must decide whether there is a reasonable possibility the plaintiff could cure the defect with an amendment." (*Schifando v. City of Los Angeles*, *supra*, 31 Cal.4th at p. 1081.) If we find that an amendment could cure the defect, then the trial court abused its discretion. (*Ibid.*)

Although our review of the complaint is de novo, the appellant still must affirmatively demonstrate that the demurrer was sustained erroneously. (*Eghtesad v. State Farm General Ins. Co.* (2020) 51 Cal.App.5th 406, 411.) Likewise, the appellant must demonstrate that the denial of leave to amend was an abuse of discretion by showing " ' "in what manner he can amend his complaint and how that amendment will change the legal effect of his pleading." ' " (*Holcomb v. Wells Fargo Bank, N.A.* (2007) 155 Cal.App.4th 490, 495 (*Holcomb*).) "We will affirm the ruling if there is any ground on which the demurrer could have been properly sustained." (*Intengan v. BAC Home Loans Servicing LP* (2013) 214 Cal.App.4th 1047, 1052.)

### 1. Breach of Contract

The first and second causes of action of the complaint are each "breach of contract" under the DAA and the BAA, respectively. In support of the first cause of action, Y.P.'s complaint alleged that Wells Fargo breached the DAA "[b]y failing to practice the contractually-promised basic standard of care." In support of this claim, Y.P. cited case law which recites that banks owe their depositors a duty of care, and Y.P. alleged that Wells Fargo "did not perform this duty of care" because it "authorized a fraudulent transaction *which [Y.P.] had warned the Wells Fargo Entities about numerous times*." The complaint further emphasized that Wells Fargo "did not follow a reasonable standard of care where, after repeated expressions of concern by [Y.P.], the Wells Fargo Entities failed to catch *the exact scheme they warned [Y.P.] of, and [Y.P.] alerted them about*."

In support of the second cause of action, Y.P.'s complaint alleged that "the BAA represent[ed] a contractual engagement between [Y.P.] and the Wells Fargo Entities for the purposes of establishing an account *under the DAA*, which would *integrate into the DAA* once the BAA was accepted." (Italics added.) The complaint further alleged that "[the BAA] was mutually performed without incident until March 21, 2022, upon the Wells Fargo Entities' *breach of the DAA . . . .*" (Italics added.)

The trial court found that the "gravamen" of the two breach of contract claims "appear[ed] to be a single claim under the DAA." We agree and accordingly focus on the first cause of action. In any event, Y.P. does not challenge this aspect of the ruling nor does his opening brief meaningfully discuss which provisions of the BAA were allegedly

9

breached, thus forfeiting any challenge to the trial court's dismissal of the second cause of action. (*Price v. Victor Valley Union High School District* (2022) 85 Cal.App.5th 231, 250.)

While " '[t]he relationship of bank and depositor is founded on contract' " (*Chazen v. Centennial Bank* (1998) 61 Cal.App.4th 532, 537), a contract between a bank and its customer "cannot disclaim a bank's responsibility for its lack of good faith or failure to exercise ordinary care . . . ." (Cal. U. Com. Code, § 4103, subd. (a).)[5] "California . . . has adopted the UCC [Uniform Commercial Code], and the UCC expressly displaces common law, to the extent that its 'particular provisions' apply. (Cal. U. Com. Code, § 1103, subd. (b).)" (*Chino Commercial Bank, N.A. v. Peters* (2010) 190 Cal.App.4th 1163, 1170.) The commercial code defines " 'ordinary care' in the case of a person engaged in business" to mean the "observance of reasonable commercial standards, prevailing in the area in which the person is located, with respect to the business in which the person is engaged."[6] (§§ 3103, 4104, subd. (c).) Thus, "in the absence of special instructions, action or nonaction consistent . . . with a general banking usage not disproved of by [the commercial code] is prima facie the exercise of ordinary care." (§ 4103, subd. (c); see *Chino*, at p 1172.) However, notwithstanding the

---

[5] All further undesignated statutory references are to the California Uniform Commercial Code (hereinafter referred to as the commercial code).

[6] Much like the DAA, section 3103 further provides that the standard of care does not require a bank to examine an instrument that it takes "for processing for collection or payment by automated means" so long as "the failure to examine does not violate the bank's prescribed procedures and the bank's procedures do not vary unreasonably from general banking usage not disapproved by this division or Division 4."

commercial code, a contract between a bank and a depositor "may determine" the bank's standard of care so long as it is not unreasonable. (§ 4103, subd. (a).)

Here, the DAA's express terms mirror the commercial code, providing that ordinary care requires Wells Fargo to "follow standards that don't vary unreasonably from the general standards followed by similarly situated banks."[7] In the complaint, Y.P. did not allege what the "general standard of similarly situated banks" is, but the implied allegation is that the applicable standard required Wells Fargo to verify, upon Y.P.'s request, whether the check was valid and whether the funds had " 'cleared' " or been finally settled.[8] However, Y.P. fails to direct us to any authority or banking practice establishing that ordinary care required Wells Fargo to do so.

*Holcomb* explained how the commercial code treats funds from a deposited check as provisional until the collecting bank receives final settlement. " 'When a customer deposits a check drawn on another bank, the customer receives a provisional credit for the amount of the check. [Citations.] [Fn. omitted.] The collecting bank, acting as the customer's agent, then forwards the check to the payor bank or a presenting bank which gives the collecting bank a provisional credit. [Citation.] If the check is forwarded to a presenting bank, the

---

[7] If an item is processed by automated means, the DAA provides that "ordinary care does not require [Wells Fargo] to examine the item." The complaint did not explicitly allege whether the fraudulent check was processed by automated means or not.

[8] We observe that the complaint did not allege that Wells Fargo failed to carry out its duties as a collecting bank under section 4202, subdivision (a).

11

presenting bank in turn presents the check to the payor bank from which the check is to be drawn and receives a provisional credit. If the payor bank does not promptly dishonor the check, the provisional settlements throughout this chain of banks become final.' [Citation.] Until final settlement for an item is made, 'any settlement given for the item is provisional.' (§ 4201.)" (*Holcomb*, *supra*, 155 Cal.App.4th at p. 497.)

Moreover, the commercial code clarifies that a deposited check is treated as a "provisional settlement" regardless of whether "credit given for the item is subject to immediate withdrawal as of right or is in fact withdrawn." (§ 4201, subd. (a).) The depositary bank may revoke the provisional settlement and "charge back the amount of any credit given for the item to its customer's account . . . if by its midnight deadline or within a longer reasonable time after it learns the facts it returns the item or sends notification of the facts." (§ 4214, subd. (a)).[9]

Again, the DAA echoes the commercial code. The DAA provides that Wells Fargo's "policy" is to make funds available "on the first business day after the day" Wells Fargo receives a deposit and that

---

[9] "A bank's ' "[m]idnight deadline" ' is defined as "midnight on its next banking day following the banking day on which it receives the relevant item or notice or from which the time for taking action commences to run, whichever is later.' (§ 4104, subd. (a)(10).) ' "Banking day" ' is defined as 'the part of a day on which a bank is open to the public for carrying on substantially all of its banking functions . . .' (§ 4104, subd. (a)(3).) Thus, whether Saturday is a banking day is determined by the banking functions offered on that day. (See, e.g., *United Bank of Crete–Steger v. Gainer Bank, N.A.* (7th Cir.1989) 874 F.2d 475, 480 [holding bank's activities of accepting deposits and allowing withdrawals were insufficient to make Saturday a 'banking day'].)" (*Holcomb*, *supra*, 155 Cal.App.4th at p. 498, fn. 4.)

funds can be withdrawn "[o]nce they are available." Yet despite making funds available to be withdrawn, the DAA expressly states that Wells Fargo does not "verify all transactions," including deposits, and that Wells Fargo can charge back an unpaid deposit if a deposited item "is returned to [Wells Fargo] unpaid."

Thus, to the extent Y.P. alleged in the complaint that ordinary care required Wells Fargo to verify the validity of the check prior to final settlement, the DAA refutes his allegations. (*Hoffman*, *supra*, 179 Cal.App.4th at p. 400; *Blatty v. New York Times Co.* (1986) 42 Cal.3d 1033, 1040.) Wells Fargo cites authority holding the same based on the commercial code. (E.g., *Sarrouf Law LLP v. First Republic Bank* (2020) 97 Mass.App.Ct. 467, 471–476 [148 N.E.3d 1243, 1247–1251] [applying California law and holding plaintiff failed to identify a contractual term or provision in the commercial code establishing that a bank owed a duty to discover a deposited check was counterfeit].)

Y.P. emphasizes he "alleged that Wells Fargo, through Ignacio, incorrectly represented in multiple statements that the Check was legitimate" and "Ignacio made these comments without any reasonable basis to do so." These allegations form the basis of his negligent misrepresentation cause of action, but not of his cause of action for breach of contract, which is based on Wells Fargo failing to "catch" the scheme Y.P. had warned about and "authoriz[ing]" a fraudulent transaction, "culminating in the improper dispersal" from his account. In addition, the complaint did not allege (nor does Y.P. provide any

13

cogent legal argument showing) that Ignacio's representations altered the DAA's express terms.[10]

Y.P. also contends that Wells Fargo breached the DAA by failing to utilize certain fraud prevention services referenced in the DAA. The DAA lists several " 'Wells Fargo services to help prevent fraud on analyzed business accounts," but these provisions do not appear to be covenants to verify deposits.

To the extent the DAA does convey a promise to prevent fraudulent deposits, the complaint alleged facts establishing that Y.P. did *not* fulfill his obligations under the DAA's terms to enjoy the benefit of the fraud services. As set forth *ante*, the DAA supplies several "recommend[ed]" steps customers should take to protect their accounts. One such step is: "Don't deposit checks from people whom you don't know. Fraudsters often request that you deposit a fake check into your account, then request that you return some of the funds. After you return the funds, the check bounces, but you are still responsible to [Wells Fargo] for the full amount of the check you deposited." The DAA further provides that business customers who "decide not to implement or use the recommended service or industry best practice or . . . fail to use it in accordance with the applicable service description or our other applicable documentation . . . are responsible for all losses that could have been prevented or mitigated by correct use of the recommended service or best practice."

---

[10] We observe that Y.P. did not allege or argue that his warning about the check constituted a "special instruction[]" pursuant to section 4103, subdivision (c).)

14

Y.P. did not allege facts stating that he knew the remitter named on the check—"Fastenal Inc."—who ostensibly was settling a debt owed to Y.P.'s client. Nor did Y.P. allege that he knew or met his client prior to receiving the check. In fact, the complaint referred to a "purported 'client' "—with the term "client" in scare quotes. Moreover, the complaint admitted that Y.P. fell victim to *the exact scheme [Wells Fargo] warned [Y.P.] of.*[11] Accordingly, by the terms of the DAA, Wells Fargo is not liable for Y.P.'s loss.[12]

We turn to whether the trial court abused its discretion in denying Y.P. leave to amend the first cause of action. We conclude it did not because Y.P. fails to show how he could amend the cause of

[11] We further observe that the complaint did not allege that Wells Fargo failed to use the advertised services. Rather, the complaint stated: "It is *unclear* whether the Wells Fargo Entities used any of their advertised fraud prevention mechanisms in the current situation, though the fact of their failure to detect this fraud militates toward their failure to use." (Italics added.) Even if this was an unequivocal factual allegation that Wells Fargo did not use the services as promised, there is no factual allegation in the complaint that sufficiently states proximate causation. Indeed, the enumerated fraud prevention services in the DAA—"Positive pay, positive pay with payee validation, or reverse positive pay"; "ACH fraud filter"; and "Payment Authorization service"—facially attempt to foil fraudulent *payments from* an account, not fraudulent *deposits into* an account. But even if we construe the complaint to include implied factual allegations that Wells Fargo failed to use the services and that its failure to do so caused Wells Fargo to fail to detect the fraudulent check, causing Y.P.'s loss, the complaint fails to state a claim for the reason stated *ante.*

[12] The DAA also expressly precluded Wells Fargo from being held "liable for anything [Wells Fargo] do[es] when following [a customer's] instructions." Here, Y.P. alleged that Wells Fargo executed the wire transfer at his direction. Thus, Wells Fargo did not breach the DAA by accepting Y.P.'s wire transfer order regardless of Y.P.'s warnings about the check.

15

action to overcome the DAA's plain terms. We disregard Y.P.'s mooted allegation that "he followed all of Wells Fargo's anti-fraud steps for depositors" because, as discussed *ante*, Y.P.'s allegations establish he did not follow all such steps. Y.P. cannot discard or avoid the factual allegations of his original complaint by making contradictory averments in an amended pleading. (*Doe v. United States Youth Soccer Assn., Inc.* (2017) 8 Cal.App.5th 1118, 1122.)

### 2. *Implied Covenant of Good Faith Claims*

The complaint's third and fourth causes of action allege breach of the implied covenant of good faith arising from the DAA and BAA, respectively. Each cause of action asserts that Wells Fargo "unfairly interfer[ed] with the rights of [Y.P.] to receive the benefits under the" applicable contract because Wells Fargo "breached [its] contractual duty of due care, and categorically refuse[d] to make [Y.P.] whole . . . substantively limiting both [Wells Fargo's] contractual obligation to operate with a duty of care and [Wells Fargo's] right to receive that duty of care."

Every contract imposes upon each party a duty of good faith and fair dealing in the performance of the contract such that neither party shall do anything to unfairly interfere with the right of any other party to receive the benefits of the contract. (*Storek & Storek, Inc. v. Citicorp Real Estate, Inc.* (2002) 100 Cal.App.4th 44, 55.) "The 'precise nature and extent of the duty imposed . . . will depend on the contractual purposes,' " but essentially "the 'implied covenant imposes upon each party the obligation to do everything that the contract presupposes they will do to accomplish its purpose.' " (*Careau & Co. v. Security Pacific Business Credit, Inc.* (1990) 222 Cal.App.3d 1371, 1393

16

(*Careau*).) However, an implied covenant of good faith and fair dealing cannot contradict the express terms of a contract. (*Storek*, at p. 55.)

Here, the complaint alleged that the breaches of the implied covenant of good faith under the DAA and BAA were due to Wells Fargo's breach of its contractual duty of due care under the DAA. As discussed *ante*, the express terms of the DAA provided that available funds from a deposit—even if withdrawn—were provisional until finally settled and could be charged back. The trial court aptly explained that Y.P.'s claim contradicted the DAA because it "would require [Wells Fargo] to hold a check until it determined that it was not a fraud despite the express contract terms." Moreover, the express terms of the DAA also stated that business customers were liable for losses if they did not follow certain practices, including "[d]on't deposit checks from people whom you don't know." Thus, Y.P.'s allegation that Wells Fargo breached the implied covenant of good faith by refusing to make him whole after falling victim to the "*the exact scheme they warned [Y.P.] of*" would contradict the express terms of the contract as well.

Y.P. cannot save his breach of implied covenant claims by seeking tort damages. "Because the [implied] covenant is a contract term, . . . compensation for its breach has almost always been limited to contract rather than tort remedies." (*Foley v. Interactive Data Corp.* (1988) 47 Cal.3d 654, 684.) "[T]ort recovery for breach of the [implied] covenant is available only in limited circumstances, generally involving a special relationship between the contracting parties, such as the relationship between an insured and its insurer." (*Bionghi v. Metropolitan Water Dist.* (1999) 70 Cal.App.4th 1358, 1370.) "[T]he bank-depositor

17

relationship is not a 'special relationship' . . . such as to give rise to tort damages when an implied contractual covenant of good faith is broken." (*Copesky v. Superior Court* (1991) 229 Cal.App.3d 678, 694.)

Y.P.'s reliance on *Careau, supra*, 222 Cal.App.3d at page 1395 is misplaced. The passage Y.P. cites explained that the " 'special relationship' existing between insurer and insured . . . is characterized by elements of public interest, adhesion and fiduciary responsibility" which in turn "justified" the existence of a tort remedy in the insurance context. (*Ibid.*) The court continued: "whether such a concept has any application in noninsurance cases appears to be increasingly problematic." (*Ibid.*) Indeed, five years later, our Supreme Court established "a general rule precluding tort recovery for noninsurance contract breach, at least in the absence of violation of 'an independent duty arising from principles of tort law' [citation] other than the bad faith denial of the existence of, or liability under, the breached contract." (*Freeman & Mills, Inc. v. Belcher Oil Co.* (1995) 11 Cal.4th 85, 102.) Y.P. failed to allege that an independent duty arose from principles of tort law and cannot do so by asserting, without legal citation, that "the relationship between individual and their banker is . . . one that obviously entails a fiduciary responsibility and adhesion." In any event, the contention is wrong as a matter of law. (*Chazen v. Centennial Bank, supra*, 61 Cal.App.4th at p. 537 ["banks 'are not fiduciaries for their depositors' "].)

Thus, the third and fourth causes of action were defective, and the trial court was correct in sustaining the demurrer to each. Because Y.P. fails to articulate specific factual allegations under which his breach of the implied covenant claims would not contradict the express

terms of the DAA, the court did not abuse its discretion by denying leave to amend the claims.

### 3. Negligent Misrepresentation

The complaint's fifth cause of action is negligent misrepresentation based on statements that Ignacio made "over the phone and in person, that the Check had cleared, and the funds were readily available." "The elements of negligent misrepresentation are '(1) the misrepresentation of a past or existing material fact, (2) without reasonable ground for believing it to be true, (3) with intent to induce another's reliance on the fact misrepresented, (4) justifiable reliance on the misrepresentation, and (5) resulting damage.' " [Citation.] While there is some conflict in the case law discussing the precise degree of particularity required in the pleading of a claim for negligent misrepresentation, there is a consensus that the causal elements, particularly the allegations of reliance, must be specifically pleaded." (*National Union Fire Ins. Co. of Pittsburgh, PA v. Cambridge Integrated Services Group, Inc.* (2009) 171 Cal.App.4th 35, 50.)

Nothing in the commercial code per se prohibits a negligent misrepresentation claim concerning a bank's statements about a check's status. (*Holcomb, supra,* 155 Cal.App.4th at pp. 498–499, and cases cited.) For example, in *Holcomb* the plaintiff alleged: "Despite the fact that, on August 7, Wells Fargo's branch manager, Viles, had told Holcomb the funds had cleared, he was informed that the $10,000.00 check drawn on [another] account had, in fact, been returned for non-sufficient funds." (*Id.* at p. 499.) *Holcomb* held that "[a] reasonable interpretation of the complaint [was] that Viles already had received notice of [payor bank's] dishonor of the check at the time

19

he told Holcomb the check had cleared and that he could write checks against the deposit." (*Ibid.*)  Assuming the truth of the bank manager's notice that the check had been dishonored, the bank manager had "no reasonable basis for telling Holcomb the check had cleared and that Holcomb could write checks against it," and therefore the complaint adequately stated a cause of action for negligent misrepresentation. (*Id.* at p. 499.)

However, *Holcomb* cautioned that "a bank should not incur liability for simply telling a depositor that he or she may write checks against deposited funds where the depository bank has granted the depositor a provisional settlement and not yet received a notice of dishonor from the payor or intermediary bank." (*Holcomb*, *supra*, 155 Cal.App.4th at p. 499.)  Indeed, the commercial code approves the practice of extending provisional credit for deposits and charging back if unpaid, and the official comment to Uniform Commercial Code section 4-214 describes the practice as "justified."  (Official Comments on U. Com. Code, Unif. Commercial Code, § 4-214.)  "Thus, a bank employee having no notice of dishonor has a reasonable basis for telling a depositor that the deposited funds are available simply because the vast majority of provisional settlements become final." (*Holcomb*, at pp. 499–500.)  But the court expounded:  "A closer question, however, is at what point a bank employee has a reasonable basis for representing to a depositor that an item has 'cleared' even though a final settlement with the payor bank has not been reached." (*Id.* at p. 500; cf. *Symonds v. Mercury Savings & Loan Assn.* (1990) 225 Cal.App.3d 1458, 1466 [stating "a collecting bank may be estopped from charging back its customer's account where the bank has represented to the customer the

check was final and the customer relied upon those representations to its detriment"].)

Wells Fargo directs us to several out of state cases holding that a depositor cannot, as a matter of law, reasonably rely on a bank employee's statement that a deposited check was "good" or "cleared" or that funds were "available." (E.g., *Colucci, Colucci, Marcus & Flavin, P.C. v. Citizens Bank of Mass.* (D. Mass., Mar. 30, 2018, No. 15-13536-GAO) 2018 U.S.Dist.LEXIS 53979, at *5–6 [applying New York law, holding that reliance on a statement concerning the availability of the funds was unreasonable as a matter of law]; *Law Offices of Oliver Zhou v. Citibank N.A.* (S.D.N.Y. May 17, 2016) 2016 U.S.Dist.LEXIS 65110, at *20 [holding reliance unreasonable where alleged misrepresentations were a " 'stamp' " stating when funds were available and a statement by a "Citibank clerk, that 'the money was available since June 18, 2013' and 'the fund was good' "]; *JPMorgan Chase Bank, N.A. v. Freyberg* (S.D.N.Y. 2016) 171 F. Supp. 3d 178, 190 [it was "likely" unreasonable under the circumstances for plaintiff to rely "as assurance that final settlement had occurred" on a statement that "the funds were unquestionably in [plaintiff's] account to send [a] wire out"]; *Margot J. Garant, Inc. v. Suffolk County Natl. Bank* (Sup.Ct. 2015) 46 Misc.3d 1218(A) [17 N.Y.S.3d 383] [misrepresentation claim "based on an alleged oral statement by SCNB advising Garant that the check had 'cleared' and that the funds were 'available' " was unreasonable as a matter of law because such terms "are not found in the UCC [citation] and their meaning is ambiguous"].)

But here, a reasonable interpretation of the complaint's allegations distinguishes Wells Fargo's authorities, creating an even

more nuanced issue than the "closer question" posed by *Holcomb*. Y.P. alleged that he called his local Wells Fargo branch "to inquire about the status of the deposited funds *and confirm that the Check was legitimate*" and, in reply, "Ignacio informed him that the Check 'cleared.'" (Italics added.) Y.P. further alleged that when he subsequently visited the local branch in person to complete the wire, Y.P. "*again raised his concerns personally to Ignacio that the Check may be fraudulent*, and that he would like to make sure that the Check cleared before he wire[d] the funds to his client," and "Ignacio told [Y.P.] 'Yes, it is all good; it is cleared and good to go.'" (Italics added.) However, Y.P. alleged that "Wells Fargo Entities had been . . . aware that the Check was fraudulent . . . by the time [Y.P.] initiated the wire transfer," and he further alleged that the branch manager later informed him that "the correct procedure for verifying whether a check is 'good' is to call the payor/issuing bank prior to doing the wire."

Taking these allegations in context, we conclude it is reasonable to interpret the complaint as alleging that Ignacio's statements that " 'the Check cleared' " and that " 'it is all good; it is cleared and good to go' " were in direct response to Y.P.'s inquiries *regarding the check's validity*, not merely the availability of the funds. The complaint further alleges that Ignacio lacked a reasonable basis for representing the check was valid because Wells Fargo has a procedure for verifying checks, which Ignacio did not follow.

Again, Wells Fargo's authorities are distinguishable because they merely concerned representations about the availability of funds, and the courts "declined to unsettle the statutory allocation of risk of loss found in UCC article 4 and . . . rejected claims of reliance on statements

22

by banks, either express or implied, that funds were 'available' or had 'cleared.' " (*Margot J. Garant, Inc. v. Suffolk County Natl. Bank, supra,* 46 Misc.3d 1218(A) [17 N.Y.S.3d 383].)  Wells Fargo does not cite any authority supporting the conclusion that holding a bank liable for making false statements *about whether it verified a check's validity* would alter the statutory allocation of risk.  Accordingly, we find Y.P.'s allegation to sufficiently state the element of justifiable reliance.

We are not persuaded by Wells Fargo's reliance on dicta in *Holcomb* that a bank only lacks reasonable belief about a check's validity if the bank has "notice of dishonor." (*Holcomb, supra,* 155 Cal.App.4th at p. 499.)[13]  Such a condition would collapse the torts of negligent misrepresentation and intentional misrepresentation.  (See, e.g., *Aton Center, Inc. v. United Healthcare Ins. Co.* (2023) 93 Cal.App.5th 1214, 1245 ["The elements of intentional misrepresentation 'are (1) a misrepresentation, (2) knowledge of falsity, (3) intent to induce reliance, (4) actual and justifiable reliance, and (5) resulting damage' "].)  To sufficiently state a cause of action for negligent misrepresentation, Y.P. needed to allege facts that Ignacio made his statement "without reasonable ground for believing it to be true." (*National Union Fire Ins. Co. of Pittsburgh, PA v. Cambridge Integrated Services Group, Inc., supra,* 171 Cal.App.4th at p. 50.)  Given Y.P.'s allegations that Ignacio's manager knew "the correct procedure for verifying whether a check is 'good' is to call the payor/issuing bank

---

[13] The trial court too erroneously suggested that Y.P. needed to allege that "Ignacio actually knew the cashier's check was bogus" to state a claim for negligent misrepresentation.

23

prior to doing the wire," the complaint alleged facts that sufficiently state this element.

Accordingly, we conclude the trial court erred in sustaining the demurrer to Y.P.'s negligent misrepresentation cause of action.

### 4. *Negligent Hiring*

The complaint's sixth cause of action is Wells Fargo's alleged negligent hiring, supervision, and retention of Ignacio. Liability for negligent hiring, supervision, and retention is distinct from vicarious liability. (*Phillips v. TLC Plumbing, Inc.* (2009) 172 Cal.App.4th 1133, 1139.) An employer may be directly liable "if it 'knew or should have known that hiring the employee created a particular risk or hazard and that particular harm materializes.' " (*Ibid.*) "To establish negligent supervision, a plaintiff must show that a person in supervisory position over the actor had prior knowledge of the actor's propensity to do the bad act." (*Z.V. v. County of Riverside* (2015) 238 Cal.App.4th 889, 902; see *Diaz v. Carcamo* (2011) 51 Cal.4th 1148, 1157 ["Awareness, constructive or actual, that a person is unfit or incompetent [for the work] underlies a claim that an employer was negligent in hiring or retaining that person . . . ."]; see also Judicial Council of Cal. Civ. Jury Instns. (2010) CACI No. 426.)

Y.P. failed to allege that Wells Fargo had notice of Ignacio's purported unfitness. Y.P. alleged that Wells Fargo "knew or should have known that it should not have hired or retained Ignacio and should have closely supervised his conduct if he was hired and retained" because Wells Fargo "knew or should have reasonably known that the Check was fraudulent . . . and that investigations concerning potentially fraudulent checks be adequately performed before making

24

. . . representations about the validity of checks to depositor." The latter allegation does not assert a fact showing that Wells Fargo should have known that Ignacio had a propensity to make false promises or misrepresentations. Y.P.'s other allegation that Wells Fargo "failed to adequately supervise Ignacio's conduct during his interactions with Plaintiff concerning the Check and wire transfer" is conclusory. The trial court did not err in sustaining the demurrer to the sixth cause of action.

Y.P. fails to articulate specific factual allegations that could cure his pleading's defect. His nebulous assertion that he could cure his complaint "by alleging additional facts demonstrating Ignacio's propensity to make the misrepresentations he made to [Y.P.]" is inadequate. If he could allege such facts, then the time to do so was in his appellate briefing. The trial court did not abuse its discretion in denying leave to amend the sixth cause of action.

\* \* \*

By failing to address the dismissal of his other three causes of action in the complaint against Wells Fargo,[14] Y.P. has forfeited them on appeal. (*Price v. Victor Valley Union High School District*, *supra*, 85 Cal.App.5th at p. 250.)

### III.   DISPOSITION

The judgment of dismissal is reversed. The order sustaining Wells Fargo's demurrer is reversed, solely as to the fifth cause of action;

---

[14] Specifically, the seventh, eighth, and twelfth causes of action for negligent failure to warn, train, or educate employees, breach of fiduciary duty, and unfair business practices, respectively.

25

we affirm in all other respects.  Each party shall bear its own costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(3), (5).)

_____
Moorman, J.[*]

WE CONCUR:


_____
Brown, P. J.


_____
Goldman, J.


A172048/*Y.P. v. Wells Fargo*


---

[*] Judge of the Superior Court of California, County of Mendocino, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

27

## _Y.P. v. Wells Fargo & Co_ (A172408)

Trial Court:      City and County of San Francisco Superior Court

Trial Judge:      Hon. Richard B. Ulmer

Attorneys:

Peretz & Associates, Yosef Peretz and David Garibaldi, for Plaintiff.

Severson & Werson, Jan Timothy Chilton and Marquis Ian Wraight, for Respondent.